IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LYNDSAY RAE JOHNSON, | ) | CASE NO. 5:21-CV-1721 |
| | ) | |
| Plaintiff, | ) | JUDGE CHARLES ESQUE FLEMING |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Lyndsay Rae Johnson ("Plaintiff" or "Johnson"), challenges the final decision of

Defendant, Kilolo Kijakazi,[1] Commissioner of Social Security ("Commissioner"), denying her

applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental

Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423,

1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the

undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for

a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that

the Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

In August 2019, Johnson filed applications for POD, DIB, and SSI, alleging a disability onset date

of September 30, 2015 and claiming she was disabled due to: depression, anxiety, "bi-polar 1-mania,"

narcolepsy, degenerative disc disease, spinal stenosis, chronic low back pain, psychosis, failed back

surgery, and ADD.  Transcript ("Tr.") at 206, 208, 235.  The applications were denied initially and upon

reconsideration, and Johnson requested a hearing before an administrative law judge ("ALJ").  Tr. 152.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

On September 1, 2020 an ALJ held a hearing, during which Johnson, represented by counsel, and an impartial vocational expert ("VE") testified.  Tr. 34-74.  On October 12, 2020, the ALJ issued a written decision finding that Johnson was not disabled.  Tr. 16-28.  The ALJ's decision became final on July 29, 2021, when the Appeals Council declined further review.  Tr. 1-3.

On September 3, 2021, Johnson filed her Complaint to challenge the Commissioner's final decision.  Doc. No. 1.  The parties have completed briefing in this case.  Doc. Nos. 8, 11, 12.  Johnson asserts the following assignments of error:

> (1)  The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived her authority from Andrew Saul was constitutionally defective.
>
> (2) The ALJ's RFC was not supported by substantial evidence as she failed to properly evaluate the totality of the evidence documenting the limitations related to Johnson's severe impairments and make a proper determination at Step Three of the Sequential Evaluation.
>
> (3) The ALJ erred in her evaluation of Johnson's symptoms as the analysis was contrary to Social Security Ruling 16-3p.

Doc. No. 8, p. 1.

## II. EVIDENCE

### A.    Personal and Vocational Evidence

Johnson was born in 1985 and was 30 years old on her alleged disability onset date.  Tr. 26.  She has at least a high school education and has prior work as a waitress and bartender.  Tr. 70.

### B.    Relevant Medical Evidence[2]

In 2013, Johnson had a lumbar MRI showing a large posterior disc protrusion at L4/5 and L5/S1 causing nerve root impingement.  Tr. 336.  She underwent a lumbar laminectomy in 2013.  Tr. 464.

In October 2014, Johnson had a brain MRI showing small white matter that may be incidental

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

and a follow-up MRI was recommended.  Tr. 383.  An April 2015 brain MRI showed small white matter unchanged since the prior study from 2014.  Tr. 381-384.

On March 1, 2016, Johnson had a follow-up at her neurologist's office for chronic migraine without aura, insomnia, vertigo, and chronic lumbar pain status post lumbar laminectomy.  Tr. 372.  She reported that her headaches were well-controlled and that her medication helped.  Tr. 372.  Upon exam, she had a normal mental exam (attention and concentration, language, memory), an unremarkable gait and station, and normal reflexes, strength, and sensation.  Tr. 373.

On April 25, 2016, Johnson saw Jose Casanova, M.D., at pain management for chronic lumbar pain.  Tr. 464-465.  Upon exam, she had full strength in her upper and lower extremities, normal muscle tone without atrophy, and normal sensation, reflexes, and coordination.  Tr. 465.  Dr. Casanova ordered an updated lumbar MRI.  Tr. 465.  On April 26, a lumbar MRI showed no central spinal stenosis, moderate bilateral foraminal stenosis at L5/S1 and mild L4/5 foraminal stenosis, and soft tissue in the L5/S1 left lateral recess that may represent disc or scar tissue.  Tr. 379-380.

On June 9, 2016, Johnson returned to Dr. Casanova, who remarked that she had a new herniated disk with bilateral L5 root compression.  Tr. 460-461.  Her medications were helping her tolerate the pain and she also used a TENS unit.  Tr. 460.  She had normal mental and physical exam findings.  Tr. 460.  At an August visit Johnson reported that her pain was "relatively well controlled" and her exam findings were normal.  Tr. 458.

On October 20, 2016, Johnson saw Dr. Casanova reporting that her lumbar pain was controlled with current medications but she had developed neck pain radiating to her shoulder the last month.  Tr. 456.  She also reported weakness in her right rib and numbness in two fingers of her right hand.  Tr. 456.  She reported having done cervical spine and right arm strengthening exercises for the last 6 weeks with no significant improvement.  Tr. 456.  Upon exam, she had right hand weakness and decreased sensation

in the right upper extremity and all other findings remained normal.  Tr. 456.  Dr. Casanova assessed chronic lumbar pain secondary to post-laminectomy syndrome and right C7 radiculitis.  Tr. 456.

In October 2016, Johnson saw Krishnan Sivaram, M.D., for mental health treatment and reported financial stressors.  Tr. 392.  Upon exam, she had a depressed mood and appropriate affect, logical thought process without delusions or hallucinations, and cooperative behavior.  Tr. 393.  She was prescribed medication.  Tr. 393.

On January 23, 2017, Johnson saw Dr. Casanova for a follow up for her lumbar pain.  Tr. 454.  She was taking "some medication as prescribed" and reported "good pain relief."  Tr. 454.  Upon exam, she had normal reflexes, sensation, and coordination and significant lumbar paraspinal tenderness.  Tr. 454.

On April 3, 2017, Johnson saw Dr. Casanova and stated that her pain was controlled with her current medications.  Tr. 452.  She complained of new numbness starting in the thoracic area and extending down both lower extremities for the last two weeks.  Tr. 452.  Upon exam, she had an unsteady gait, full strength in her upper extremities, mild weakness in her hip flexors, and decreased sensation in her lower extremities.  Tr. 452.  Dr. Casanova added a diagnosis of failed back syndrome and ordered a brain and thoracic spine MRI.  Tr. 452, 453.

On April 24, 2017, Johnson saw Dr. Sivaram and reported that she was "not doing well"; she had been out of her medications and could feel the difference.  Tr. 394.  Upon exam, she had a depressed mood, anxious affect, retarded motor activity/speech, and logical thought process without delusions or hallucinations.  Tr. 394.  Dr. Sivaram restarted her medications.  Tr. 395.

On June 19, 2017, Johnson returned to Dr. Casanova.  Tr. 450.  Her thoracic MRI was unremarkable and her numbness had resolved.  Tr. 450.  Upon exam, her reflexes, coordination, and sensation were normal.  Tr. 450.  On September 18, she reported no change and her pain was well

4

controlled with medications.  Tr. 448.  Upon exam, she had full strength in her upper and lower

extremities and normal muscle tone, reflexes, sensation, and coordination.  Tr. 448.

On November 27, 2017, Johnson saw Dr. Casanova for follow-up visit and reported an increase

in pain in her lumbar spine and lower extremities from waitressing full-time.  Tr. 446.  Her pain

medication was still working well and she complained of having sleep paralysis.  Tr. 446.  Her exam

findings were the same as her prior visit and Dr. Casanova continued her medications and referred her

for a polysomnogram to evaluate for narcolepsy.  Tr. 446.

On February 15, 2018, Johnson saw Dr. Casanova and reported that she did well with her pain

during the preceding November and December but it had worsened since January.  Tr. 444.  Upon exam,

she had significant spasticity in her lumbar paraspinal muscles and normal reflexes, sensation and

coordination.  Tr. 444.  Dr. Casanova wrote that Johnson appeared to be doing well on her medications.

Tr. 444.

On March 28, 2018, Johnson saw Dr. Sivaram.  Tr. 396.  She stated that she had had a bad panic

attack and almost called 911.  Tr. 396.  Upon exam, she had an anxious mood, a depressed affect,

normal speech, logical thought process, fair insight, memory, judgment, and concentration, and a normal

gait.  Tr. 397.  Her medications were continued.  Tr. 398.

On May 7, 2018, Johnson saw Dr. Casanova and reported that her migraines were becoming

more frequent.  Tr. 442.  She denied any medication side effects.  Tr. 442.  Upon exam, she had positive

straight leg raise testing on the right and decreased sensation along the right lower extremity.  Tr. 442.

Dr. Casanova added a diagnosis of "migraine without aura, no intractable status" and prescribed Maxalt

for her headaches.  Tr. 443.

On July 1, 2018, Johnson saw Dr. Casanova and did not report headaches and Dr. Casanova did

not include that diagnosis on her list.  Tr. 440-441.  She reported significant back pain, controlled with

medications, denied medication side effects, and endorsed no other medical problems.  Tr. 440.  Upon exam, she had significant lumbar tenderness with decreased range of motion and normal reflexes, sensation, and coordination.  Tr. 440.

On July 11, 2018, Johnson saw Dr. Sivaram for ongoing depression and anxiety with concerns about going to college.  Tr. 400.  Her medications were helping.  Tr. 400.  Upon exam, she had an anxious mood, appropriate affect, normal speech, logical thought processes with no delusions or hallucinations, cooperative behavior, fair memory, insight, and judgment, and good concentration.  Tr. 401.

On September 20, 2018, Johnson saw Dr. Casanova reporting that her back pain was controlled with medication and rated her pain as 3-5/10.  Tr. 436.  She again complained of sleep paralysis upon waking up and falling asleep during the day.  Tr. 436.  She also reported that she was more awake and active during the day since she began taking Adderall for her ADD.  Tr. 436.  She had a normal exam.  Tr. 436.  Dr. Casanova again referred Johnson for a sleep study and continued her medications.  Tr. 437.

On October 10, 2018, Johnson saw psychiatric nurse practitioner Denise Hewitt; her case had been transferred from Dr. Sivaram.  Tr. 403.  She reported that her Klonopin was helpful and that her Adderall helped with focus, attention, and anxiety for a few hours and then she would fall asleep.  Tr. 403.  Upon exam, she was calm and cooperative, had logical thought process, a euthymic mood, appropriate affect, and good memory, insight/judgment, and concentration.  Tr. 404-405.  Hewitt decreased her Klonopin.  Tr. 406.

On November 26, 2018, Johnson saw Dr. Casanova and stated that her pain was well-controlled with medications.  Tr. 434.  Dr. Casanova stated that her sleep study result was "highly suggestive of narcolepsy."  Tr. 434, 312.  Her exam results were normal and Dr. Casanova referred her to a sleep physician.  Tr. 434-435.

On December 28, 2018, Johnson saw neurologist Damien Earl, M.D., for narcolepsy.  Tr. 362-366.  She stated that she had not experienced any headaches since Dr. Casanova prescribed Maxalt.  Tr. 362.  She reported decreasing her Klonopin and feeling a little panicky.  Tr. 362.  Upon exam, she had a normal gait and station.  Tr. 364.  Dr. Earl counseled her on her diet and continued her medications.  Tr. 364.

On January 15, 2019, Johnson saw Hewitt and reported having had panic attacks the last few weeks.  Tr. 407.  Her Klonopin was helpful and she wanted to try to manage her panic attacks through diet rather than medication.  Tr. 407.  Upon exam, she was calm and cooperative, had logical thought process, a euthymic mood, appropriate affect, and good memory, insight, judgment, and concentration.  Tr. 408-409.

On January 28, 2019, Johnson saw Dr. Casanova and reported doing well and her medications were controlling her pain.  Tr. 433.  Upon exam, she had normal examination findings, including improved lumbar range of motion.  Tr. 433.

On February 15, 2019, Dr. Earl wrote a letter on Johnson's behalf stating that, despite treatment for narcolepsy, Johnson "continues to have significant sleepiness and sleep attacks that can impede her ability in getting assignments done in a timely manner."  Tr. 314.

On March 11, 2019, Johnson saw Dr. Casanova complaining of increased pain in her right lower extremity since falling in January.  Tr. 431.  The past two weeks her pain had improved but she was not back to her baseline.  Tr. 431.  Her oxycodone resolved her pain and caused minimum side effects.  Tr. 431.  Upon exam, she had normal reflexes, sensation, and coordination and no significant weakness in her right lower extremity.  Tr. 431, 432.  Dr. Casanova stated that a February 2019 MRI of her thoracic spine was normal and a lumbar MRI showed minimal retrolisthesis at L4/5 and mild impingement of the L5 nerve.  Tr. 432, 483.  He added a diagnosis of subacute L5 radiculitis, "which is improving."  Tr.

432.

On April 10, 2019, Johnson saw Hewitt and reported fewer panic attacks.  Tr. 411.

On June 24, 2019, Johnson saw Hewitt and denied depression, endorsed continued anxiety but no panic attacks, and stated that she was taking Adderall for narcolepsy.  Tr. 415.  She was still sleeping despite the Adderall and was always late for things, which contributed to her anxiety.  Tr. 415.  Upon exam, she was calm and cooperative, had logical thought process, a euthymic mood, appropriate affect, and good memory, insight, judgment, and concentration.  Tr. 417.

On July 25, 2019, Johnson was psychiatrically hospitalized with manic and psychotic symptoms.  Tr. 316.  She had stopped taking her medications.  Tr. 316, 319.  She was treated with medication and "steadily improved [] with appropriate treatment including medications and supportive educative counseling" and discharged on August 4.  Tr. 316, 317.  She was diagnosed with bipolar I with psychotic symptoms and severe opioid sedative hypnotic use disorder.  Tr. 316.

On August 8, 2019, Johnson had a follow up appointment with Dr. Earl for her narcolepsy.  Tr. 341-345.  She reported her recent psychotic episode; she had not slept for 4 days and had topped taking her Adderall.  Tr. 341.  She was still not taking Adderall and she stated that she was a zombie during the day and could not function.  Tr. 341.  She endorsed fatigue; nausea; extremity weakness, memory impairment, numbness and tremors; anxiety and insomnia; back pain, joint pain, muscle weakness; and easy bruising.  Tr. 343.  Upon exam, she was alert and oriented, had normal speech and language, and a normal gait and station.  Tr. 344.  Dr. Earl prescribed medication, including restarting her Adderall to take twice a day.  Tr. 344.

On August 27, 2019, Johnson followed up with Hewitt and reported some tremors, which Adderall helped, and somnolence throughout the day.  Tr. 424.  Upon exam, she was calm and cooperative, had logical thought process without psychotic symptoms, a euthymic mood, appropriate

8

affect, fair insight and judgment, and good memory and concentration.  Tr. 426.  Hewitt adjusted her medications.  Tr. 428.

On September 9, 2019, Johnson followed up with Dr. Casanova for her lumbar pain.  Tr. 429. Dr. Casanova listed her diagnoses: post-laminectomy syndrome, chronic pain syndrome, and narcolepsy. Tr. 429.  Johnson reported her recent hospitalization and stated that she was "completely pain free" since then and was no longer taking any pain medication.  Tr. 429.  Her exam findings were normal and Dr. Casanova's impression was chronic pain syndrome and failed back syndrome, which appeared to have been resolved after her hospitalization.  Tr. 429.

On October 9, 2019, Johnson saw Hewitt and reported that her mood was "terrible."  Tr. 534. She had increased depression and had been in bed the last month due to decreased energy and lack of motivation to do tasks.  Tr. 534.  She had missed her counseling appointment the day before due to sleeping.  Tr. 534.  Upon exam, she was alert, cooperative, had normal speech and thought process, was talkative, had an irritable mood and affect, good memory and concentration, fair insight and judgment, and a steady gait.  Tr. 536.  Hewitt adjusted her medications.  Tr. 538.

On November 14, 2019, Johnson saw Hewitt and reported increased anxiety and panic attacks. Tr. 539.  She also endorsed anhedonia, decreased energy, lack of motivation, daily anger, headaches, back pain, and muscle tension.  Tr. 539.  She was no longer prescribed Klonopin for her anxiety and asked about taking it.  Tr. 540.  Her exam findings were as her prior visit except that her memory and concentration were fair.  Tr. 541.  On November 19 she saw Dr. Sivaram, who changed her medication. Tr. 544.

On November 25, 2019, Johnson returned to Dr. Casanova for a follow-up visit.  Tr. 584.  She reported severe pain in her lumbar spine radiating to her bilateral lower extremities and right shoulder and arm pain.  Tr. 584.  Upon exam, she had normal reflexes, sensation, and coordination.  Tr. 584.  Dr.

9

Casanova restarted her pain medication and she was to continue physical therapy and lumbar exercises. Tr. 584.

On January 29, 2020, Johnson saw a nurse practitioner for a follow up for high blood pressure and to discuss her blood pressure medication (clonidine) and her anxiety.  Tr. 563.  She reported having trouble sleeping due to anxiety.  Tr. 563.  Upon exam, she had normal muscle tone and strength in her extremities, a normal affect, appropriate speech, cooperative attitude, normal affect, normal attention and concentration, and grossly intact insight, judgment, and memory.  Tr. 564.

On February 25, 2020, Johnson saw her counselor and reported that she had gone to the emergency room for her anxiety three days prior to address her panic, which, she stated, was caused by discontinuing pain management services.  Tr. 938.

On March 3, 2020, Johnson visited a different mental health practice, Phoenix Rising, for a second opinion.  Tr. 610.  Upon exam, she was cooperative, had an anxious mood, full affect, clear speech, logical thought process, normal perception, an obsessional thought content due to preoccupations/ruminations, and insight and judgment within normal limits.  Tr. 614-615.

On March 10, 2020, Johnson advised her prior counselor that she had scheduled an appointment with a different practice for another opinion on her mental health medications; she did not feel that counseling or medication was helping to lower her anxiety to a functional level.  Tr. 940.  Her counselor used cognitive behavioral therapy to explore Johnson's irrational beliefs and disputed her negative thoughts that others with the same symptoms of anxiety can use skills effectively to control them.  Tr. 940.

On April 14, 2020, Johnson had a counseling evaluation via telephone with Certified Nurse Practitioner Catherine Buswell at Phoenix Rising.  Tr. 596-601.  Her mood appeared depressed, anxious, and irritable, her speech was clear, her thought process was logical, and her thought content and

perception were within normal limits. Tr. 597.

On April 17, 2020, Johnson had a telemed visit with a nurse practitioner at her primary care office and reported that she was concerned about her blood pressure and she was having an intense amount of anxiety and pain. Tr. 790.

On April 21, 2020, Johnson went to the emergency room complaining of a generalized feeling of being unwell. Tr. 762. She was assessed with mild general weakness and encouraged to hydrate. Tr. 767.

On April 28, 2020, Johnson had a telemed appointment with Dr. Earl for a narcolepsy follow-up. Tr. 916-920. The treatment note states that at her last visit Johnson stated that she did not want to keep trying stimulants. Tr. 916. She slept better overall but still woke up during the night and was lethargic during the day. Tr. 917. Dr. Earl wrote, "Not a pressing issue right now though. She continues to worry about anxiety." Tr. 917.

On May 4, 2020, Johnson saw Dr. Rajiv Taliwal for an evaluation of her low back pain. Tr. 858. Upon exam, she had a painful lumbar range of motion, full strength in her lower extremities, negative straight leg raise testing, and normal ambulation without difficulty. Tr. 860. Dr. Taliwal wrote that they discussed operative treatment and agreed to proceed with non-operative treatment: continue a home exercise program; obtain an MRI; and return for a follow-up. Tr. 861. A lumbar MRI on May 22 showed an L4-5 disc bulge with moderate canal stenosis, right lateral recess stenosis, and moderate neural foraminal narrowing at L4-5 and L5-S1. Tr. 667–668.

On May 14, 2020, Johnson had a telemed appointment with Buswell. Tr. 590, 595. Upon exam, she was cooperative, had an anxious mood, clear speech, was preoccupied, and had somatic delusions. Tr. 591. Buswell diagnosed her with bipolar in partial remission, severe anxiety disorder, PTSD, and unspecified psychosis. Tr. 593.

11

On June 1, 2020, Johnson saw Dr. Taliwal for a follow-up; she also complained of shoulder blade and arm pain.  Tr. 661.  Dr. Taliwal ordered cervical spine x-rays, which showed cervical spondylosis with good balance and alignment with no instability.  Tr. 660.  Upon exam, she had negative signs, normal results in all her upper and lower extremities, and painful cervical and lumbar spine range of motion with extension.  Tr. 663.  Dr. Taliwal assessed spinal stenosis of lumbosacral region, cervical spondylosis with radiculopathy, degeneration of intervertebral disc at L4/S1, and history of lumbar discectomy.  Tr. 665.  It was again agreed that Johnson would proceed with non-operative treatment: continue her home exercise program, physical therapy, and over-the-counter anti-inflammatory and pain medications.  Tr. 665.

On June 22, 2020, Johnson went to the emergency room complaining of shortness of breath, fatigue, weakness, and not sleeping.  Tr. 742.  She reported taking her Depakote as needed, about 3 times a week, and the attending physician suggested that she take it daily and she agreed to call her counselor.  Tr. 742-743, 746-747.  She was assessed with bipolar disorder.  Tr. 747.

On June 27, 2020, Johnson went to a crisis counseling center.  Tr. 649.  She reported that she was diagnosed with bipolar disorder and recounted an emergency room visit some days prior for "vague manic-like symptoms" and multiple somatic complaints.  Tr. 649.  She stated that lights and sounds were amplified and that she had been off her medications.  Tr. 649.  On June 30, Johnson had a counseling session.  Tr. 620.  Upon exam, her findings were normal.  Tr. 620-621.  Thereafter she attended a group therapy session.  Tr. 624-627.

On July 2, 2020, Johnson returned to her original mental health provider and saw Daniel Butts, M.D.  Tr. 952.  She reported her recent history and stated that she was taking a new medication and an increased dose of Depakote.  Tr. 952.  She felt improved overall, with no signs or symptoms of acute psychosis or mania and persistent, but stable, anxiety and depression.  Tr. 952.  She worried about

gaining weight on her new medication but it was working and she had no adverse side effects. Tr. 952. Sleep was always an issue due to her narcolepsy, for which she saw a neurologist. Tr. 952. Upon exam, she was calm, quiet and cooperative, had normal speech, logical though process, a congruent mood and affect, fair insight, and good memory, judgment, and concentration. Tr. 953. At a counseling visit on July 7, Johnson reported increased mania and talked about going to the crisis center, explained that she had tried to manage her symptoms on her own but could not, and affirmed that her symptoms were under control with her current medication and made her feel better, but she disliked the weight gain it caused and she was going to try to get her medications changed. Tr. 956. On July 21, her anxiety and depression had decreased. Tr. 958.

On July 21, 2020, Johnson saw a medical provider and described her migraines as "rare." Tr. 899.

A cervical spine MRI on August 3, 2020, showed minimal posterior disc bulging at C3-4 and C5-6. Tr. 689.

On August 10, 2020, Dr. Taliwal filled out a 4-page medical source statement on Johnson's behalf. Tr. 911- 914. He only completed the first page and did not provide any functional limitations. He listed Johnson's diagnoses and symptoms and summarized her MRI findings ("mild degenerative disc disease without stenosis" of the cervical spine, "moderate stenosis with degenerative disc disease" of the lumbar spine). Tr. 911.

**C.     State Agency Reports**

On October 31, 2019, Venkatachala Sreenivas, M.D., reviewed Johnson's record and, regarding her physical RFC, found that she could perform light work with postural and environmental limitations. Tr. 83-85. On March 11, 2020, Abraham Mikalov, M.D., affirmed Dr. Sreenivas' findings. Tr. 113-114.

On October 31, 2019, Vicki Warren, Ph.D., reviewed Johnson's record and, regarding her mental RFC, found that Johnson could carry out routine tasks in settings without strict time or production demands; work with the general public, coworkers, and supervisors on a superficial/occasional basis; and work in a relatively static work environment where changes are few, infrequent, and can be explained in advance.  Tr. 85-87.  On March 3, 2020, Aracelis Rivera, Psy.D., affirmed Dr. Warren's findings.  Tr. 114–115.

## D.    Hearing Testimony

During the September 1, 2020 hearing, Johnson testified to the following:

- She lives in a house with her two children, aged 9 and 12.  Tr. 42.  She is able to drive and prefers to make short trips—to take her children to school or go to the grocery store—because sometimes she can feel a sleep attack coming on.  Tr. 42.  Sometimes her mother or boyfriend will drive for her.  Tr. 42.  If she took stimulants she could drive longer, but she is not taking stimulants because her anxiety is too great.  Tr. 42.

- She had gone back to college online in 2018 but stopped after she was hospitalized with psychosis with five classes remaining until graduation.  Tr. 43-44.  Now she can't focus.  Tr. 44.  She is also licensed to give facial treatments, but her narcolepsy was causing her to get tired in a room with low music and low lights.  Tr. 46.  She wanted to become a hairdresser and had training in 2014 and 2016 but had to stop because she couldn't stand in one place to do someone's hair.  Tr. 46-47.

- When asked why she has been unable to work full time since 2015, she stated that her back has been bothering her again; at a recent visit to her orthopedic surgeon "he [] put surgery on the table again."  Tr. 54.  She is not in a rush to have back surgery again because recovery from it is terrible.  Tr. 54.  Also, she noticed that she was falling asleep more often and getting tired while driving and she was diagnosed with narcolepsy.  Tr. 54.  She has always had depression and anxiety, but now she has been diagnosed with panic disorder so she can't stay on the narcolepsy medication.  Tr. 54.  She could not stay awake long enough to work a shift.  Tr. 54.  She has extreme daytime sleepiness and at night she'll get anxiety and hallucinations.  Tr. 54.  When she was hospitalized, she had gone in for a UTI and became so confused after 3 days of antibiotics that she blacked out completely and it was the scariest thing in her life.  Tr. 55.  After she got out, she had the worst depression and anxiety, and she would just lie in bed and not want to do anything.  Tr. 55.  She thinks half the problem was the medication she was given that caused strong side effects.  Tr. 55.  She went to the crisis center and she went to the hospital 3 times in 3 months because her panic attacks were so bad and she thought there was something physically wrong with her.  Tr. 55.  Lately she has been feeling paranoid.  Tr. 67.  She has a panic attack about 2-3 times a week.  Tr. 67.

14

- Her anxiety became a problem when, last year, they took her off an anxiety medication that had worked for her.  Tr. 56.  She is still tired every day.  Tr. 57.

- She has side effects from her medications.  Tr. 57.  She is not taking a stimulant for her narcolepsy because it stimulates her too much or causes anxiety.  Tr. 57.  The anxiety medication makes her so tired that she has to take a nap during the day.  Tr. 57.  She has insomnia and takes medication to make sure she sleeps.  Tr. 58.  Her bipolar medication makes her feel like a zombie.  Tr. 58.  It's hard to get a happy medium.  Tr. 58.  Also, she has gained 50 pounds.  Tr. 58.  When asked if her medications had been changed quite a bit to try to figure it out, she stated that she had started a lower dose of one medication and it was too low; that is how she wound up in the hospital the last time she was there.  Tr. 59.  Now she is back on a higher dose but feels like she can't stay awake during the day.  Tr. 59.  And because she sees her doctor every 6-8 weeks, it is taking a long time to make changes to figure out what will work.  Tr. 59.

- Regarding her back, her lumbar laminectomy helped her leg numbness but not her pain.  Tr. 59-60.  If feels like it is bone on bone, especially when she bends down, and her left leg is becoming numb again.  Tr. 60.  It's hard to do things around the house; standing more than 10 minutes to do the dishes makes her cry.  Tr. 60.  Walking is better; she can walk for about 20 minutes or one mile.  Tr. 60-61.  Pain medications take the edge off.  Tr. 60-61.  She estimated she could lift and carry about 10 pounds, sit for 45-60 minutes, and stand for 15 minutes.  Tr. 61-62.

- On a typical day, she wakes up about 5:00 am from back pain, takes an ibuprofen, and goes to sleep for a few more hours.  Tr. 62-63.  She gets her kids up around 7:00 and takes them to school.  Tr. 63.  She may experience anxiety, in which case she takes her blood pressure medication, which knocks her back until about noon.  Tr. 63.  Then she does small things around the house—laundry, starts dinner—and picks her kids up around 3:00 pm.  Tr. 63.  She might do more laundry, feed the kids dinner, help them with homework or watch a movie, them she takes her medication around 8:00 pm and goes to sleep around 11:00 or 12:00.  Tr. 63.

- Her Adderall helps her narcolepsy, but she was taken a higher dose, which was helping, but then she had to be hospitalized, and she thought that the Adderall was causing her to ruminate over her hospital stay.  Tr. 68.  She would like to revisit taking Adderall in the future.  Tr. 68.

The VE confirmed that Johnson's past relevant work was as a waitress and bartender.  Tr. 70.

The ALJ asked the VE whether a hypothetical individual with the same age, education and work experience as Johnson could perform Johnson's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below.  Tr. 70-71.  The VE answered that such an individual could not perform Johnson's past work but could perform the following

representative jobs in the economy: cleaner, place marker, and garment sorter.  Tr. 71.  The ALJ asked

what the permitted off-task time and absenteeism rate in the workplace was and the VE stated that an

individual could be off-task no more than 10% of the day or absent no more than once a month.  Tr. 72.

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of

disability and must prove an inability to engage "in substantial gainful activity by reason of any medically

determinable physical or mental impairment," or combination of impairments, that can be expected to

"result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).  A claimant is entitled to a POD only if: (1) she

had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled

or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v.

Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must

meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-

stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594

F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant

must demonstrate that **s**he is not currently engaged in "substantial gainful activity" at the time of the

disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that

she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§

404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or

mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not

performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve

16

months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2022.

2. The claimant has not engaged in substantial gainful activity since September 30, 2015, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: degenerative disc disease and stenosis of the lumbar spine; degenerative disc disease of the cervical spine, with radiculopathy; obesity; bipolar disorder; anxiety disorder; dysthymic disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, or crawl; must avoid all exposure to dangerous moving machinery or unprotected heights, and should not perform commercial driving. She can perform simple, routine tasks in an environment free of fastpaced production requirements or strict production quotas, and with infrequent changes, with any changes explained in advance. She can have superficial interactions with others, defined as no tasks involving arbitration, confrontation, negotiation, directing the work of others, or being responsible for the safety or welfare of others.

17

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on May **, 1985 and was 30 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from September 30, 2015, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 18-27.

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make

18

credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot

19

determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A. Johnson's constitutional challenge fails

Andrew Saul became Commissioner of the Social Security Administration on June 17, 2019, pursuant to 42 U.S.C. § 902(a).[3]  Section 902(a)(3) provides, "An individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office."  *Id.*  That portion of § 902(a)(3) violates the separation of powers because it limits the President's authority to remove the Commissioner without cause.  *See Seila Law LLC v. Consumer Financial Protection Bureau*, -- U.S. --, 140 S. Ct. 2183, 2197 (2020) (statutory restriction on the President's ability to remove the head of an agency ("for inefficiency, neglect, or malfeasance") violates the separation of powers and is unconstitutional); *Collins v. Yellen*, -- U.S. --, 141 S. Ct. 1761, 1787-89 (2021) (statutory restriction on the President's ability to remove the head of an agency (e.g., "for cause," "neglect of duty, or malfeasance in office") violates the separation of powers and is unconstitutional).

The parties disagree as to what effect that unconstitutional removal restriction has on the ALJ's determination of Johnson's disability application.  Johnson argues that she is entitled to remand for a new hearing and decision.  Defendant disagrees, asserting that Johnson must show that the unconstitutional removal restriction caused the denial of her benefits claim and that she does not make such a showing.

In *Seila Law*, the Court found that the unconstitutional removal provision was severable from the

---

[3]  https://www.ssa.gov/history/saul.html.  Saul is no longer the Commissioner.

other provisions of the relevant statute but did not discuss what a plaintiff must show to obtain relief

when challenging actions taken by the head of an agency who derived powers from a statute that

included an unconstitutional removal provision.  140 S. Ct. at 2208, 2211.  In *Collins*, the Court took up

that discussion and provided guidance regarding the kind of compensable harm a plaintiff must show to

be entitled to relief.  141 S.Ct. at 1787-1789.

### 1. *Collins v. Yellen*

*Collins* involved the Federal Housing Finance Agency ("FHFA"), an agency created by

Congress tasked with regulating Fannie Mae and Freddie Mac, two of the country's leading sources of

mortgage financing.  141 S.Ct. at 1770.  Pursuant to the statute creating the FHFA, the head of the

agency was a Director removable by the President "only 'for cause.'"  *Id*.  Fannie Mae and Freddie Mac

shareholders challenged an agreement the FHFA had made with the United States Treasury (the "third

amendment"), which channeled money from Fannie Mae and Freddie Mac to the Treasury rather than

shareholders.  *Id*.  They argued that the removal provision in the FHFA statute was unconstitutional

because, by restricting the President's power to remove the FHFA Director, the statute the violated

separation of powers.  *Id*. at 1787.  The Court agreed.  *Id*. (citing *Seila Law*, 140 S. Ct. at 2205).  But the

Court did not provide the shareholders the remedy that they sought—that "the third amendment must be

completely undone"—for the following reasons.

First, the shareholders had sought to undo the third amendment because it was "adopted and

implemented by officers who lacked constitutional authority and that their actions were therefore void

*ab initio*."  *Id*.  But the Court noted that the third amendment was adopted by the FHFA's Acting

Director, whose position did not have the improper removal restriction that the Director's position had

had, so the shareholders' attempt to set aside the third amendment "in its entirety" failed.  *Id*. at 1783,

1787.  Next, regarding the shareholders' argument with respect to the actions that Directors had taken to

implement the third amendment, the Court reasoned,

> All the officers who headed the FHFA during the time in question were properly *appointed*. Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office.  As a result, there is no reason to regard any of the actions taken by the FHFA in relation to the third amendment as void.

*Id*. at 1787 (emphasis in original).

The Court went on to explain that an unconstitutional provision like the removal restriction could inflict compensable harm, and gave the following examples:

> Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way. In those situations, the statutory provision would clearly cause harm.

*Id*. at 1789.  The Court remanded the case for consideration of the shareholder's suggestion that "the President might have replaced one of the confirmed Directors who supervised the implementation of the third amendment, or a confirmed Director might have altered his behavior in a way that would have benefited the shareholder."  *Id*. at 1789.

### 2. Johnson does not show compensable harm and is not entitled to a remand

Johnson argues that the government deprived her of a "valid administrative process" because the ALJ who decided her case was "delegated" authority by then-Commissioner Saul, "which means that [the ALJ's] ability to make findings of fact and issue a final decision was constitutionally defective." Doc. No. 8, p. 12; Doc. No. 12, p. 3.[4]  But the argument that Saul had no authority to carry out the functions of his office because the removal restriction was unconstitutional was rejected by the Court in *Collins*. 141 S.Ct. at 1788, n.23 ("[T]he unlawfulness of the removal provision does not strip the

---

[4] Defendant asserts, and Johnson does not dispute, that the ALJ who decided her case was not appointed by Saul, but by Saul's predecessor, then-Acting Commissioner Berryhill.  Doc. No. 11, pp. 14-15; Doc. No. 12, p. 8.  Berryhill's appointment as Acting Commissioner was not made pursuant to § 902(a)(3); did not contain a "for cause" removal provision; and, thus, was not unconstitutional.  *See Collins*, 141 S.Ct. at 1782.

Director of the power to undertake the other responsibilities of his office").  Because Saul had the authority to carry out the functions of his office, the ALJ who decided Johnson's case while Saul was Commissioner cannot have issued a *per se* unconstitutional decision just because authority had been "delegated" to him by Saul.  *Id.*; *see also Reese v. Kijakazi*, 2022 WL 831122, at *3 (N.D. Ohio Mar. 21, 2022) (rejecting the claimant's argument because he did not describe compensable harm due to the unconstitutional removal provision in § 902(a)(3), collecting cases).

Johnson contends, "The ALJ in this matter decided this case based on regulations promulgated by Mr. Saul when he had no authority to issue the same….This means that a presumptively inaccurate legal standard was utilized by both the ALJ and the Appeals Council to adjudicate this claim[.]"  Doc. No. 8, p. 12; Doc. No. 12, pp. 4-5.  Her argument fails because, as stated above, the unconstitutional removal provision did not strip Saul of his authority to fulfill his obligations of office, including promulgating regulations.  Moreover, she does not identify what regulations Saul promulgated that the ALJ used to decide her case.  In short, she has not shown compensable harm of the type described by the Court in *Collins*.

In her reply brief, Johnson argues that the Social Security Commissioner could only be removed for neglect of duty or malfeasance of office, which is a higher standard for removal than the statutes at issue in *Seila Law* and *Collins*.  Doc. No. 12, p. 4 (citing 42 U.S.C. § 902(a)(3)).  Thus, Johnson claims, "the issue in this matter was even more unconstitutional."  Doc. No. 12, p. 4.  But she cites no legal authority indicating that the compensable harm requirement in *Collins* is meant to be applied on a sliding scale depending on the removal language in the relevant statute.  She argues that while Saul was Commissioner "he implemented changes in HALLEX which modified the way in which decisions were written (I-2-3-20 in effect July 17, 2019)" and in DI 34121.013 and DI 34121.015, which modified the way musculoskeletal impairments are evaluated.  Doc. No. 12, pp. 6-7.  However, she does not describe

23

how those changes impacted her application.

Finally, Johnson argues that when President Biden terminated Saul, he made statements from which it can be "inferred" that he was dissatisfied with Saul and it "appeared" that the President "believed that Mr. Saul had infringed on the constitutional due process rights of disability applicants such as Johnson." Doc. No. 8, p. 13. Such watery allegations are insufficient to show the type of compensable harm stemming from the unconstitutional removal provision that was described in *Collins*. In sum, the undersigned find that Johnson's constitutional challenge fails.

**B. The ALJ did not err at step two[5]**

Johnson argues that the ALJ erred at step two when she did not find her narcolepsy to be a severe impairment and did not mention her headaches. Doc. No. 8, p. 16. At step two of the sequential evaluation, an ALJ must determine whether a claimant has a "severe" impairment. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) & 416.920(a)(4)(ii). To determine if a claimant has a severe impairment, the ALJ must find that an impairment or combination of impairments significantly limits the claimant's physical or mental ability to do "basic work activities." *See* 20 C.F.R. § 416.920(c). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243, n.2 (6th Cir. 2007) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). When an ALJ finds both severe and non-severe impairments at step two and continues with subsequent steps in the sequential evaluation process, error, if any, at step two may not warrant reversal. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the failure to find an impairment severe at step two is not reversible error

---

[5] The undersigned notes that Johnson's counsel is an experienced Social Security practitioner who regularly practices in this Court and has been warned before about her continued practice of lumping various challenges to different steps of the sequential disability evaluation together. *See, e.g.*, Case No. 1:21-cv-00556, Doc. No. 19, p. 34, n.7 (filed 3/2/2022); Case No. 5:20-cv-02850, Doc. No. 19, p. 34, n. 5 (filed 2/2/2022); see also Case No. 5:20-cv-01340, Doc. No. 21, p. 26, n. 9 (filed 8/16//2021); Case No. 1:20-cv-01186, Doc. No. 21, p. 25, n. 8 (filed 8/16/2021). Counsel's failure to present arguments in a way that the Court can address them, and Defendant can respond to them, may result, in the future, in the Court deeming an argument to be improper and/or declining to grant a requested page extension.

when the ALJ continues through the remaining steps of the evaluation and can consider non-severe impairments when assessing an RFC); *Anthony v. Astrue*, 266 Fed. App'x 451, 457 (6th Cir. 2008); *Hedges v. Comm'r of Soc. Sec.*, 725 Fed. App'x 394, 395 (6th Cir. 2018).  "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider the limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" *Nejat v. Comm'r of Soc. Sec.*, 359 Fed. App'x 574, 577 (6th Cir. 2009) (emphasis in original, quoting SSR 96-8p).

*Headaches*.  Johnson argues that she had been diagnosed with a migraine in 2016.  Doc. No. 8, p. 17 (citing Tr. 372).  But that day she reported that her migraines were controlled by medication.  Tr. 372.  The next record evidence in which Johnson sought treatment for a migraine occurred in May 2018; Dr. Casanova prescribed medication (Tr. 443) and Johnson thereafter reported that that medication helped (Tr. 362).  In July 2020 Johnson described her migraines as "rare."  Tr. 899.  Although Johnson cites treatment notes in which she endorsed headaches (Doc. No. 8, p. 17 (citing Tr. 525, 918, 923)), she does not cite evidence that she sought treatment for them and she did not report that they caused any disabling symptoms at the hearing or in her disability paperwork or function report.  Tr. 34-74, 235, 248-255.  Thus, the undersigned finds that Johnson has not shown that her headaches are a medically determinable impairment such that the ALJ was required to consider them in her analysis.  *See* 20 C.F.R. § 416.921 ("If you are not doing substantial gainful activity, we will then determine whether you have a medically determinable physical or mental impairment(s)....After we establish that you have a medically determinable impairment(s), then we determine whether your impairment(s) is severe.").

*Narcolepsy*.  Johnson argues that the ALJ erred when she found that Johnson's narcolepsy was not a severe impairment.  Doc. No. 8, p. 15.  At step two, the ALJ wrote,

> Although the claimant's records additionally indicate that she is diagnosed with narcolepsy and insomnia, these two conditions are treated with Adderall and Ambien. (Ex. 1F/3; 9F/1, 6, 7) While her records reflect ongoing follow-up for these conditions, her March 2020 records summarize the claimant's symptoms, as reflected throughout the longitudinal record:

> Still very drowsy, but sleeping better with pain management and ambien at night. A big concern right now is the chronic pain and the fact that it is only controlled with opioid medication and having trouble finding a new pain physician. From my standpoint if you do end up taking Suboxone, this would not affect my willingness to prescribed (sic) controlled medication in general. As with anything risks and benefits have to be weighed. Right now the risk of too much sedation at night from Xyrem outweighs the risk of drowsiness from untreated narcolepsy during the daytime. However, If you end up on a stable pain regimen and can avoid sedating opioid medication at night, then Xyrem would be a reasonable option for treating narcolepsy. (Ex. 19F/9)

> The record does not show a non-opioid pain regimen, and the claimant has reported approximately 4-hours of effectiveness per dose of Adderall, but "is not interested in taking more stimulants," due to reports of increased anxiety. (Ex. 19F/6) The weighing of effective treatment and side effects noted in the record suggests that the claimant is choosing pain management over other treatment options for narcolepsy, but that Adderall at 4-hour intervals is effective in mitigating her symptoms. A record from April 2020 indicates that the claimant's diagnosis of narcolepsy is not causing severe hypersomnia right now and is not a pressing issue to treat during the pandemic. (Ex. 19F/77).

> Taken as a whole, there is insufficient support in the records that narcolepsy has more than a minimal impact upon the claimant's ability to perform basic work activity, as effective treatment options are reported and noted, but not utilized due to other medications.

Tr. 19.

Johnson does not challenge the ALJ's reasoning or the evidence the ALJ cited in support of her step two finding. Rather, she reiterates some of the evidence in the record showing that she has narcolepsy and concludes, "the medical evidence documented Johnson's narcolepsy and insomnia. Johnson provided more than *de minimus* evidence of these impairments and the problems they imposed." Doc. No. 8, pp. 15-16. But the ALJ disagreed, in a thoughtful passage that Johnson does not articulate a specific challenge to, and the undersigned declines to cast about for, and develop, an argument on Johnson's behalf. Moreover, it is well-settled that "[t]he mere diagnosis of [an impairment] says nothing about the severity of the condition." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988). And because the ALJ found that Johnson had other impairments that were severe and considered Johnson's severe and non-severe impairments at the remaining steps of her evaluation (Tr.

19, 22, 24), the fact that Johnson's narcolepsy was deemed not to be severe at step two is "legally irrelevant." *Anthony*, 266 Fed.App'x at 457.  Indeed, the basis for the ALJ's RFC limitation that Johnson avoid dangerous moving machinery, unprotected heights, and commercial driving was her narcolepsy.  Tr. 25 (adopting the state agency reviewers' opinions), 114 (state agency reviewers limiting Johnson to no dangerous moving machinery, unprotected heights, and commercial driving due to her narcolepsy).

Johnson's argument that the ALJ erred when she failed to evaluate whether Johnson's narcolepsy satisfied Listing 11.02 (Epilepsy) pursuant to the rule in POMS DI 24580.005 (Evaluation of Narcolepsy) fails.  Doc. No. 8, pp. 17-18.  First, POMS guidelines are not legally binding on the Court and do not bind the Commissioner.  *See Paxton v. Comm'r of Soc. Sec.*, 2020 WL 3026233, at *8 (S.D. Ohio June 5, 2020)[6] (rejecting the claimant's argument that the POMS guidelines serve as a basis for reversing the ALJ's decision; "It is well-established that the POMS, as not subject to the formal rule-making procedure found in the Administrative Procedure Act, does not have the force of law[,]" citing *Davis v. Sec'y of Health & Human Servs.*, 867 F.2d 336, 340 (6th Cir. 1989) ("the POMS is a policy and procedure manual that employees of the Department of Health & Human Services use in evaluating Social Security claims and does not have the force and effect of law")); *Selyak v. Comm'r of Soc. Sec.*, 2018 WL 3244618, at *11 (N.D. Ohio May 22, 2018).[7]  Next, POMS DI 24580.005 provides, "[I]t is important to obtain from an ongoing treatment source a description of the medications used and the response to the medication[.]"[8]  But the ALJ cited a description of the medications Johnson used and her responses to it written by her narcolepsy treatment provider in March 2020.  Thus, Johnson has not shown that the ALJ violated POMS DI 24580.005, even if it did control.

---

[6] Report and recommendation adopted, 2020 WL 4669887 (S.D. Ohio Aug. 12, 2020).

[7] Report and recommendation adopted, 2018 WL 3241241 (N.D. Ohio July 3, 2018).

[8] https://secure.ssa.gov/poms.nsf/lnx/0424580005 (last visited 4/14/2022).

Accordingly, the undersigned finds that Johnson has not shown that the ALJ committed an error at step two.

## C. The ALJ did not err at step three

Johnson argues that the ALJ erred at step three.  At step three of the disability evaluation process, a claimant will be found disabled if her impairment(s) meets or equals one of the listings in the Listing of Impairments.  20 C.F.R. § 404.1520(a)(4)(iii).  The claimant bears the burden of establishing that her condition meets or equals a listing.  *Thacker v. Soc. Sec. Admin.*, 93 Fed. App'x 725, 727-728 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)). Thus, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."  *Id.* at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)).  "Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing" and a claimant "must satisfy all the criteria to meet the listing." *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x 411, 414 (6th Cir. 2011) (internal quotation marks omitted).

Johnson purports to challenge the ALJ's step three finding with respect to her spinal impairment. Doc. No. 8, pp. 14, 19.  However, she does not cite, or challenge, the ALJ's step three finding.  Rather, she challenges the ALJ's evaluation of her pain in light of her spinal imaging results at step four of the ALJ's evaluation.  Doc. No. 8, pp. 19-20 (citing the ALJ's decision at Tr. 22 detailing the imaging results and arguing that the ALJ failed to consider that imaging when evaluating her pain complaints). But, as Johnson herself concedes, the ALJ considered her imaging (Tr. 22, 23); she also considered Johnson's reports of pain in conjunction with her treatment notes and imaging results (Tr. 22, 23, 24). Johnson does not argue that the ALJ made an error when evaluating her imaging results.  And while she

argues that he ALJ "failed to articulate any rationale beyond the boilerplate paragraph finding that Johnson's symptoms were not entirely consistent with the medical evidence and other evidence in the record" (Doc. No. 8, p. 28), her argument is belied by the ALJ's decision.  The ALJ explained,

> While the longitudinal record objectively supports some degree of limitations in the claimant's functional ability, even in construing the evidence in the manner most favorable to her allegations, the objective medical evidence indicates mild-to-moderate degenerative changes, with conservative treatment through pain management, over-the-counter pain medications, and recommendation for exercise and physical therapy. There is sufficient support for symptoms which limit her to the performance of light exertion lifting, carrying, sitting, and standing tasks, but there is only subjective reports of greater limitations. The degenerative changes of claimant's lumbar spine, and cervical radiculopathy symptoms are sufficient to support that she can never climb ladders, ropes, or scaffolds, and only occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl, and that she must avoid all exposure to dangerous moving machinery, unprotected heights, and commercial driving.

Tr. 23-24.  Thus, the undersigned finds that Johnson's challenge to the ALJ's consideration of her spinal impairment fails.

Next, Johnson argues that the ALJ erred when she evaluated her mental impairments at step three.  Doc. No. 8, p. 20-23.  She disagrees with the ALJ's paragraph B criteria findings that Johnson had a moderate limitation in interacting with others, concentrating, persisting or maintaining pace, and adapting or managing oneself.  Doc. No. 8, p. 23; Doc No. 12, p. 2.  The ALJ wrote,

> In interacting with others, the claimant has a moderate limitation. The claimant testified to feelings of paranoia when she leaves her home, as if her neighbors are watching her. She additionally described isolating behavior, partially attributed to social distancing during COVID-19, but also due to symptoms of anxiety. The records of evidence show treatment for those symptoms, but that they have been moderate in nature.

> With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. Although the claimant explicitly alleged compromised concentration, the records of evidence support only moderately limiting symptoms. (Ex. 3E) There are multiple notations that Adderall is effective in keeping the claimant alert for approximately 4 hours at a time, but that she foregoes the afternoon dose when she feels increased anxiety symptoms. (Ex. 6F/34; 10F/6) Claimant's symptoms are sufficiently mitigated to the degree that she chooses to forego medications which are effective in treating the same.

> As for adapting or managing oneself, the claimant has a moderate limitation. The claimant testified to moderate disruptions of her activities of daily living, but also that she

continues to help her children with school work, and perform typical household chores. While she indicated limited motivation and increased stress related to the present health climate and ongoing Pandemic, her records support only moderate limitations in this area of functioning.

Tr. 20-21.

In her brief, Johnson reiterates evidence of her mental impairments (Doc. No. 8, pp. 21-22) and concludes, "The evidence referenced by the ALJ was contrary to the evidence as detailed above." Doc. No. 8, p. 23. But beyond disagreeing with the ALJ's step three finding, Johnson does not explain what about the ALJ's explanation is faulty. The ALJ cited evidence that is relevant to each domain she discussed and Johnson does not allege that the evidence the ALJ cited was incorrect. Later in her decision, the ALJ discussed in greater detail the evidence cited by Johnson. Tr. 24-25. Again, Johnson has failed to develop a specific argument or line of reasoning in support of her assertion that the ALJ erred at step three, and the undersigned is unable to divine from her brief what argument or theory is being advanced. *See also McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted).

Johnson's assertion that "It is unclear what evidence, if any, was used by the ALJ in making her conclusions that Johnson only had moderate limitations" (Doc. No. 8, p. 23) is without merit; as shown above, the ALJ cited evidence when concluding that Johnson had moderate limitations. Johnson argues, "Even if Johnson could complete some activities, the Southern District of Ohio has held that the ability to perform some activities on a limited basis is not substantial evidence that a claimant's symptoms were not disabling." Doc. No. 8, p. 24 (citing *Lorman v. Comm'r of Soc. Sec.*, 107 F.Supp.3d 829, 838 (S.D. Ohio 2015)). But in *Lorman* the court found that the plaintiff's ability to perform household duties was not substantial evidence to support the ALJ's finding that the plaintiff could perform substantial gainful

activity. *Id*. *Lorman* did not address the ability to perform activities in the context of whether a claimant satisfies a listing at step three. And Johnson's argument that the ALJ "offered only a perfunctory analysis of what she considered to be the relevant Listings and related functional limitations" (Doc. No. 8, p. 25) fails because and ALJ is not required to provide extensive reasoning at step three. *See Forrest v. Comm'r of Soc. Sec.*, 591 Fed. App'x 359, 365-366 (6th Cir. Nov. 17, 2014) (minimal reasoning at step three is not reversible error when the claimant did not argue at the hearing that he met a listing and the ALJ provided sufficient explanation elsewhere in the decision).

In sum, the undersigned finds that Johnson has not shown that the ALJ erred at step three.

### D. The ALJ did not err at step four

Johnson argues that the ALJ erred because she "did not consider the effect of the combination of Johnson's physical and psychological impairments and whether they supported the ALJ's decision finding that she was capable of performing work on a sustained and full-time basis." Doc. No. 8, p. 26. Johnson does not describe what effect the combination of her impairments had that the ALJ failed to consider; she has failed to develop her argument and it is waived. *See McPherson*, 125 F.3d at 995-996. Moreover, the ALJ recognized the correlating nature of Johnson's treatment for her physical and mental impairments. Tr. 19, 24.

Next, Johnson states that Social Security Ruling 96-8p "mandates that the RFC assessment must include a narrative discussion describing how the evidence supports each conclusion and describe the maximum amount of each work-related activity the person can perform based on the evidence." Doc. No. 8, p. 26. She contends that the ALJ "is responsible for indicating what evidence is relied upon and cannot ignore evidence that does not support the decision, especially if the analysis would change if that evidence was accepted." Doc. No. 8, p. 26. She concedes that the ALJ discussed "much of the evidence in this matter but disregarded any evidence which supported Johnson's testimony regarding her

limitations, especially as related to the continuing effect of her narcolepsy" and "failed to provide sufficient information so this Court can facilitate meaningful judicial review."  Doc. No. 8, pp. 26-27.

The undersigned disagrees.  The ALJ discussed Johnson's statements regarding her narcolepsy (and other impairments, Tr. 22) and explained why he discounted her testimony.  With respect to her narcolepsy, the ALJ explained why she found that it had a minimal impact upon Johnson's ability to perform basic work activity.  Tr. 19.  As for her spinal impairments, the ALJ discussed the evidence in a narrative format (Tr. 22-23) and concluded that the objective evidence showed mild-to-moderate degenerative changes, conservative treatment, and recommendations for exercise and physical therapy, which undercut Johnson's allegations regarding the severity of her symptoms.  Tr. 23.  The ALJ explained that that evidence supported a finding that Johnson could perform light work with postural and environmental restrictions.  Tr. 23-24.  Regarding her mental impairments, the ALJ discussed the evidence in narrative format (Tr. 24-25) and concluded that Johnson's symptoms are generally moderate in nature (with the exception of one incident of exacerbation of psychotic symptoms attributed to prescription withdrawal) and that she had had little counseling or therapy treatment, which showed that she was capable of performing simple, routine tasks performed in an environment free of fast-paced production requirements or strict production quotas and with infrequent changes explained in advance. Tr. 25.  And, due to Johnson's reports of paranoia, the ALJ limited her to superficial interactions with others.  Tr. 25.  It cannot be said that the ALJ failed to provide sufficient information for the Court to conduct a meaningful review, as Johnson alleges.  Johnson's unspecified assertion that the ALJ did not "build an accurate and logical bridge between the evidence and the result" (Doc. No. 8, p. 27) fails for the same reason.

Johnson's remaining arguments are also without merit.  She argues that the ALJ did not comply with SSR 16-3p, which addresses how an ALJ evaluates a claimant's subjective reports of symptoms.

Doc. No. 8, p. 30; SSR 16-3p, 2017 WL 5180304, at *5-8 (Oct. 25, 2017) (to evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, treatment received, daily activities, and other evidence). But the ALJ considered Johnson's complaints, the objective medical evidence, treatment she received, and daily activities. Johnson does not cite the portion of SSR 16-3p that she believes the ALJ violated. She complains that the ALJ did not discuss the function report completed by Johnson's mother, Doc. No. 8, p. 30, but the ALJ is not required to discuss every piece of evidence in the record. *Thacker v. Comm'r of Soc. Sec.*, 99 Fed. App'x 661, 665 (6th Cir. 2004).

 For all the reasons stated above, the undersigned finds that Johnson has not shown that the ALJ erred. Accordingly, the undersigned recommends that the Commissioner's decision be affirmed.

## VII. CONCLUSION

 For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: April 14, 2022       *s/ Jonathan Greenberg*
               Jonathan D. Greenberg
               United States Magistrate Judge

### OBJECTIONS
**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).**